**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Local 134 Board of Trustees  Case No. 3:10CV1869
    of the Toledo Roofers Pension Plan,

    Plaintiff

    v.  **ORDER**

Enterprise Roofing & Sheet Metal Co.

    and

Enterprise Roofing & Remodeling Services, Inc.,

    Defendants

This is an ERISA[1] pension withdrawal liability case in which plaintiff, Local 134 Board of Trustees of the Toledo Roofers Pension Plan (the Plan), claims defendant, Enterprise Roofing and Remodeling Services, Inc. (Services), remains liable for a prior judgment I entered against Enterprise Roofing & Sheet Metal Co. (Sheet Metal). (Doc. 59). I base this decision on the testimony presented and evidence submitted at the November 6-8, 2012, bench trial. (*see* Docs. 71-73, 80-81, excerpts of transcripts).

For the following reasons, I conclude that Services is responsible for satisfying the judgment against Sheet Metal.

Jurisdiction exists under 28 U.S.C. § 1331.

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461.

**Background**

Before going out of business in 2009, Sheet Metal provided primarily commercial roofing and sheet metal services in Northwest Ohio and Southern Michigan for over seventy years. Sheet Metal operated as a union company and participated in a multi-employer pension plan under a collective bargaining agreement with the Toledo Area Roofing Contractor's Association and Local Union 134, the United Union of Roofers, Waterproofers, and Allied Workers.

Services, a non-union company founded in 1992, provides primarily residential roofing and remodeling services to the same geographical region as Sheet Metal.

The parties dispute the degree to which the two defendant companies, Sheet Metal and Services, overlap. The Plan asserts that the companies overlapped so substantially that Services, which remains in business, should retain responsibility for the now defunct Sheet Metal's liability to the Plan.

In general, a plan participant, such as Sheet Metal, remains liable for contributions owed to a plan to cover future benefits even after it goes out of business and "withdraws" from the plan. I previously entered a judgment ordering Sheet Metal to pay the Plan $624,079 to fund future benefits. (Doc. 59). Because Sheet Metal cannot satisfy the judgment, the Plan now seeks to collect that sum from Services, an entity owned and operated by the same family.

**Trial Testimony**

Richard Entenman's grandfather opened Sheet Metal in 1932. Richard started working with the business in 1983 and served as Vice President beginning in 1984. From 1987 until he resigned 1998, he served as Sheet Metal's President. (Doc. 71, pp 3-4, 11).

2

Richard stated that, while he ran Sheet Metal, it performed both commercial and residential roofing projects. (Doc. 71, p 11). When founded, Sheet Metal worked primarily on residential projects, and Richard learned his trade working residential jobs. Richard formed Services in 1992. (Doc. 71, p 12).

Richard explained he formed Services because he realized Sheet Metal would probably fail. (Doc. 71, p 14). When he joined Sheet Metal in 1983 it was in disarray. It lacked quality management, salespeople, and workers, and had suffered significant setbacks that led to very high workers compensation premiums. (Doc. 71, p 12).

In December, 1992, Janice Entenman, Richard's wife, incorporated Services. At that time, Richard was Sheet Metal's president. Richard helped Janice, who had no roofing or operational experience, form Services. (Doc. 71, pp 16-17). Richard stated he and Janice used the same attorney who represented Sheet Metal to form Services. (Doc. 71, p 16). Two Sheet Metal employees who worked directly under Richard left Sheet Metal to serve as Services' managers. Although Janice had no role in running or managing Services, she received all its stock. (Doc. 71, p 17).

Richard explained why all of the stock was issued to Janice:

*Q.*   Okay. What was the reason that you put 100 percent of the shares in Janis' name instead of your own when the company was organized?

*A.*   It was illegal.

*Q.*   It was illegal to what?

*A.*   You can't run a union and a non-union company at the same time. It had to be separate ownership. That's where legal counsel came in. That's where my research came in.

*Q.*   There you go. So at the time you organized this, you were still working and running Enterprise Sheet Metal, right?

3

    *A.*    Yes.

    *Q.*    And so to avoid that union problem, you had 100 percent of the stock put in your wife's name, right?

    *A.*    Yes.

[Doc. 71, p 18.]

Richard also explained why he decided to name Enterprise Roofing & Services[2]:

    *Q.*    Now, the company that was originally incorporated was named Enterprise Roofing Services, Inc.

    *A.*    Yes.

    *Q.*    Okay. And since 1932, Enterprise Roofing & Sheet Metal, Inc. was a family owned business, right?

    *A.*    Yes.

    *Q.*    Okay. And you'll agree with me, won't you, that Enterprise Services – Enterprise Roofing & Services is pretty close to Enterprise Roofing & Sheet Metal, right?

    *A.*    Well, Enterprise, yeah. That's –

                              ***

    *Q.*    And did you believe at the time that you were organizing the new company that you were going to get a benefit for using a very similar name to the company that was organized back in 1932?

    *A.*    The benefit is the name.

    *THE COURT*:    The good will, right?

    *THE WITNESS*:    Good will, yes, sir.

[Doc. 71, p 18-19.]

---

[2] Richard later changed Services' name to indicate it offered remodeling services as well. (Doc. 71, p 76).

Richard resigned from Sheet Metal on March 31, 1998. However, he retained an ownership interest after he resigned, and continued assisting his father and sons in operating Sheet Metal. From 1998 to 2003, Richard also ran another roofing business, Reliance Roofing, in Bowling Green. (Doc. 71, p 77). In 2003, Richard became the President of Services after receiving all ownership interest from Janice through their divorce. (Doc. 71, p 24).

Richard's son, Todd Entenman, began working for Services in 2003, and Sheet Metal in the Fall of 2004.[3] (Doc. 71, p 25; Doc. 72, p 4). When he began with Services, he had no formal education or training in either accounting or corporate structures. (Doc. 80, pp 7-8).

Todd acknowledged that Richard had warned him they needed to keep the companies strictly separate to avoid violating union rules. He stated he had heard of "double breasting," where a company simultaneously takes advantage of union and nonunion labor. He knew this was not permissible under union rules. (Doc. 80, pp 8-9).

Todd stated that, when he started at Sheet Metal, he worked only as a receptionist. As time went on, he gained more responsibility and began acting as a manager or corporate officer.[4] (Doc. 72, pp 18-19).

When Todd started working for Services, Sheet Metal had separate office space (but in the same building). They also had separate computers, phone systems, and software accounting systems. (Doc 79, pp 25-26; Doc. 80, p 8-9).

---

[3] Richard said he remembered it was Fall because the Cleveland Browns were playing. (Doc. 80, p 5).

[4] As noted below, Todd stated he did not grow into an officer role at Services, but remained only a clerical or administrative secretary. (Doc. 72, pp 4-5).

After about a year, Todd began consolidating the companies' resources. He began using the same phone system[5] and accountant for both companies. (Doc. 80, pp 9-10). Each company continued to pay Todd separately, and also kept separate files, books, cellular phones, and addresses. Todd testified they also maintained distinct stock ownership, separate officers, and filed separate tax returns. The only shared employees were family members. (Doc. 80, pp 11-12). Todd performed the bookkeeping for both Services and Sheet Metal during this time. (Doc. 71, p 76). He consolidated the office work for his convenience and so he could work both jobs at once. (Doc. 72, pp 51-52).

Todd acknowledged he created an advertisement that stated Services had served the Toledo area since 1932 although he knew Richard formed Services in 1992. (Doc. 80, pp 14-15). He stated that customers and the public frequently confused the companies and sent correspondence to the wrong company. (Doc. 80, p 15).

The parties disputed Todd's role at Services, where he served as "secretary" during this time. (Doc. 80, p 2). The Plan claims Todd served as Service's corporate or managerial secretary, and thus played a key role in Service's business. Services claims Todd served as a clerical or administrative secretary, and therefore lacked any real importance in business decisions.[6] (Doc. 72, pp 4-5). Todd testified he only worked as a clerical secretary, but admitted to signing documents as a corporate officer on Service's behalf. (Doc. 72, pp 6-7). He admitted he and Richard signed an IRS document

---

[5] Each company retained a separate line that rang to one phone, which Todd answered. (Doc. 72, p 13).

[6] As noted in n.4, *supra*, Todd stated he did grow into a role as an officer with Sheet Metal before assuming ownership of that company. (Doc. 72, p 18-19).

6

for Services. Richard signed as President and, next to his signature, Todd signed as Secretary. (Doc. 72, pp 7-8.).

In 2005, Richard, Todd, David (Todd's brother), an attorney, and a financial planner discussed changing the ownership structure at Sheet Metal. The financial planner discussed the state of the two companies at that time:

> *Q.* When you say their businesses overlapped, what do you mean?
>
> *A.* I mean they ran their businesses in conjunction with one another, that there was not clear separation between – among any of the parties in this.
>
> *Q.* Can you tell me whether or not each corporation had a separate ID number?
>
> *A.* I'm sure they did.
>
> *Q.* Did they file a separate tax return?
>
> *A.* I saw them for Don and Audrey and for their business, yes. I assume that was so.
>
> *Q.* Did it have separate employees?
>
> *A.* Yes.
>
> *Q.* Did it have separate equipment?
>
> *A.* I'm not sure that all the equipment was separate, no.
>
> *Q.* You don't know?
>
> *A.* I said I am not sure that all equipment was separate, no.
>
> *Q.* So what do you mean by that statement?
>
> *A.* I mean that I am not sure that all equipment was used separately by a particular corporate entity.
>
> *Q.* But you don't know that it wasn't, by the same hand?

>     A.      I'm also saying to you that the businesses were so intertwined that it would be very hard to make that assumption.

[Doc. 71, pp 72-73.]

To allow Sheet Metal's owners, Richard's parents, to retire, Todd and David took over ownership. (Doc. 71, p 76). At that time, Richard learned Sheet Metal owed Services about $192,000 that his sons had taken without Richard's knowledge from Services on Sheet Metal's behalf. Although Richard and his sons discussed executing a promissory note for repayment, they never did so. (Doc. 71, p 76; Doc. 72, pp 23-24).

>    Richard discussed the nature of the borrowing:
>
>    Q.    Well, there's some testimony from your sons that some of the initial transfers of money from Enterprise to Sheet Metal was authorized by you. Would you agree that you authorized some of the early transfers?
>
>    A.    If it was assumed I authorized it or if I was asked, look, it's like father/son. Look, dad, we don't have any money. We don't have any supplies. We can't make payroll. What are we going to do? I said, well, you can borrow the money, but I want it paid back ASAP, as soon as that job is done. Oh, yeah, no problem.
>
>    Also keep in mind my father was still living and still active, although his body was not well. So I don't know, again, with what happened between he and I, what he was doing behind the scenes with Todd, I don't know.
>
>    Q.    But once you discovered this in November of 2005 during the Hartman meetings, did you restrict Todd's ability to transfer or write checks on behalf of Enterprise Services?
>
>    A.     It was this – see, there was new hope in 2005. The company's now on a new playing field. So we got, like, two chapters. The first chapter is, okay, that's behind us; we're going to get it back with the recovery. So –
>
>    Q.    So to answer my question, did you restrict Todd's ability to write additional checks from Enterprise Services?
>
>    A.    Not in a formal sense.

> *Q.* Okay. Did you do anything formal as far as bringing charges against him? Did you do anything criminal as a result of the information you learned?
>
> *A.* Counsel, these are my children. Whether or not – I mean, it has caused tremendous difficulty in our relationship to this day. I made it clear this was inappropriate; this was not in the corporate interest. This was, you know, against all principles of accounting and bank loan covenants. I said this is not proper and it needs to be recorded, and you guys need to get it paid back.

[Doc. 71, pp 35-36.]

In March, 2006, Todd and David, took over ownership of Sheet Metal (Doc. 80, pp 19-20). The corporate books listed Todd and David as the sole shareholders, officers, and directors. (Doc. 80, p 20). However, Richard and his brother (and thus Uncle to Todd and David), Doug, attended corporate meetings with Todd and David. (Doc. 80, pp 20-21). At one meeting, Richard agreed to assume a larger role in overseeing Sheet Metal's operations. Todd explained that he expected Richard to lend his financial and business expertise, and mentor David. (Doc. 71, p 37; Doc. 80, p 24). Sheet Metal did not allow David to write checks without Todd's or Richard's permission, but Sheet Metal did not give Richard the authority to write checks himself. (Doc. 80, p 21).

After Todd and David took over Sheet Metal, they continued to borrow funds informally from Services and use Services' credit accounts to purchase supplies for jobs. (Doc. 71, p 39; Doc. 72, pp 33-34; Doc. 80, pp 29-30). Todd stated that he sometimes discussed borrowing the money or credit with Richard before doing so. Other times, he simply helped himself without Richard's knowledge. (Doc. 80, pp 30-31).

Richard finally cut off Sheet Metal's borrowing in 2009, after Sheet Metal had taken an estimated $300,000. David, although not a signatory to Sheet Metal's bank account, also issued himself personal checks totaling $57,132 after becoming an owner of Sheet Metal. He considered

these personal loans. (Doc. 72, pp 42-44). After learning of the continued unauthorized "borrowing," Richard did not take any legal action against his sons or Services, and the money was never repaid. (Doc. 71, pp 76-77).

During this period, Sheet Metal employed between two and ten union workers, depending on the season. Services employed about the same number, but none of its employees were members of a union. (Doc. 72, pp 68-69).

Although Sheet Metal operated out of Services' building, there was never a written lease agreement between the companies, and Sheet Metal never in fact paid rent. They also used the same accounting firms. (Doc. 71, pp 50-51). Todd discussed how the companies sometimes shared equipment:

> *A.* Well, you have to understand in a family business, unfortunately there are tools laying around and, you know, if a vehicle broke down or something of that manner, and I can't recall specifically because I was not in the field, but if a vehicle broke down, we needed to make sure that these guys get in their eight hours; they would have to use one of Services' trucks. We had to make sure that the customer was satisfied. And I think that goes with tools as well. So unfortunately, you know, growing up in the family, you know, your toys and your things are not always yours, although they are, if you know what Im saying.
>
> *Q.* So it's your testimony that on occasion there might be situations where Sheet Metal employees would utilize vehicles or tools that were, in fact, Enterprise Services', correct?
>
> *A.* I am sure it happened, yeah.
>
> *Q.* And it is fair to say that in reverse, there were times when Enterprise Services' employees may have used vehicles and equipment that were essentially the items owned by Enterprise Sheet Metal?
>
> *A.* Yeah. I mean, the two companies were sharing the same building and, you know, putting back tools in their proper place, they probably didn't even know; they just took what was there, I would imagine, to do the job. [Doc. 72, pp 30-31.]

After Sheet Metal went out of business, Services continued using all of its vehicles. However, Services never paid Sheet Metal or its owners for them. (Doc. 72, p 71).

Although Richard stated it was a clerical oversight, he remained listed as a signatory on Sheet Metal's bank account through 2007. (Doc. 71, p 76). Services' website stated it had been in business since 1932, when Sheet Metal opened. (Doc. 71, p 51). Services did at least some work for several of Sheet Metal's commercial clients after Sheet Metal closed. (Doc. 71, pp 52-53). On those projects, Services did essentially the same kind of work that Sheet Metal had performed. (Doc. 71, p 59).

Richard, while working with Services, continued to use some of his former Sheet Metal clients as references. He explained that he told potential clients about all of his experience in roofing and remodeling. (Doc. 71, pp 62-63).

Sheet Metal and Services sometimes worked with the same clients. Sheet Metal did initial installation work, and Services did later repairs. (Doc. 72, pp 12-13). After Sheet Metal went out of business, Services paid to keep the phone line operating. Services would inform Sheet Metal's former clients that it was defunct, and offered to do the work. (Doc. 72, pp 12-14).

Although Richard testified he had no connection with Sheet Metal after its transfer to David and Todd, he signed a document in 2006 as its "Chairman of the Board." (Doc. 72, p 48). After Sheet Metal went out of business, Todd continued to work for Services. During that time, he remained a signatory to its bank account with the ability to write checks on its behalf. (Doc. 72, p 91).

In 2009, Sheet Metal closed. The Plan notified both Sheet Metal and Services that it would seek to collect the withdrawal liability from them. The Plan sued both companies, and I granted

11

summary judgment against Sheet Metal. (Doc. 59). The Plan now seeks to enforce that judgment against Services.

**Discussion**

The Plan seeks to hold Services liable for the judgment against Sheet Metal under the "alter ego" doctrine.[7] That doctrine "prevent[s] employers from evading obligations under the Act merely by changing or altering their corporate form." *Trustees of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 248 (6th Cir. 2005). Under this equitable doctrine, a court may bind an employer to a collective bargaining agreement if it finds the employer an alter ego of a signatory employer.[8] *Id.* at 318.

"Where two companies are engaged in the same business in the same marketplace, courts ask 'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012) (quoting *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)); *Trustees of the Detroit Carpenters Fringe Benefit Funds v. Industrial Contracting, LLC*, 581 F.3d 313, 315 (6th Cir. 2009); *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576 (6th Cir. 1986). The court has stated that the test requires a plaintiff to show "pervasive intermingling of funds and operations . . . to support a finding that two companies are alter egos of one another." *Resilient Floor*, 395 F.3d at 249.

---

[7] The Plan also seeks to hold Services liable under statutory common control and successorship theories. Because I find services liable as an alter ego of Sheet Metal, I decline to reach these arguments.

[8] I address only whether Services should be bound to the collective bargaining agreement for purposes of satisfying the judgment I previously entered against Sheet Metal.

"'[A] finding of employer intent is not essential or prerequisite to imposition of alter ego status . . . [but] is merely one of the relevant factors which the courts can consider.'" *Detroit Carpenters*, 581 F.3d at 315 (quoting *Allcoast Transfer*, 780 F.2d at 576). A court should consider all of the above-listed factors together, and no factor is necessary nor dispositive. *Allcoast*, 780 F.2d at 581-582. "[T]o effectuate federal labor policies, the courts . . . have applied . . . the alter ego doctrine in a more relaxed, less exacting fashion than would be required under federal common law." *Fullerton Transfer*, 910 F.2d at 336; *Rd. Sprinkler Fitters*, *supra*, 699 F.3d at 794.

### 1. **Management, Operations, and Ownership**

The Sixth Circuit recently stated that, when two businesses are owned by the same family, "even though the characters are the same and are related to one another, this does not necessarily mean the overall nature of management is the same in both companies." *Rd. Sprinkler Fitters*, *supra,* 669 F.3d at 795. Rather, a court should consider the nature of each person's managerial role to determine whether the companies' management substantially overlapped. *Id*.

Richard played a major role in managing both Sheet Metal and Services. A long-time employee of Sheet Metal, he served as its Vice President and President. I find it fair to infer that, after leaving Sheet Metal, Richard continued to have a strong influence on its management. Later, Sheet Metal allowed Richard to oversee when David, a half-owner of Sheet Metal, could write corporate checks. Richard agreed to mentor and supervise David in running the company's day-to-day operations. He attended corporate meetings, as informal as those meetings may have been, to assist his sons in making important business decisions. One document listed him as Sheet Metal's "Chairman of the Board." Todd stated he regularly sought Richard's advice regarding how to run the business. At the time he formed Services, Richard was the person most intimately involved in

13

Sheet Metal's operations. It appears he continued that involvement on a regular, albeit informal basis, in later years.

I reject Service's attempt to downplay Richard's involvement by characterizing it as normal father-son advice. Although I would expect a father in Richard's position to provide such advice and act as he did, this does not change the fact that he retained significant control over Services after he left. That is, it may explain why Todd and David allowed him to influence Sheet Metal's management after he left. However, the reason for allowing such control and influence is not the inquiry; rather, it is the extent to which he actually exerted the control that matters.

Todd also served important managerial functions at both companies. After taking ownership of Sheet Metal, he stated he officially began acting as its corporate officer and manager. However, before taking ownership of Sheet Metal, Todd acknowledged he slowly gained responsibility for the company's operations, to the extent that he considered himself an officer or manager. During that time, Richard retained an ownership interest in Sheet Metal and continued to help with its management. Richard, it seems, was at least one of the people who gave Todd his increased control at Sheet Metal. After forming Services, Todd worked there in a similar capacity as he did at Services. I cannot, therefore, credit Todd's testimony that he retained a very limited role at Services while taking on significant responsibilities for running Sheet Metal.[9]

This is especially true in light of Todd's control over Service's corporate funds. Services allowed Todd unfettered discretion to write checks, charge accounts, and issue payroll, without any oversight. A true receptionist does not ordinarily retain such authority without some system of accountability. I am willing to accept Richard's and Todd's testimony that much of Todd's use of

---

[9] In fact, in one document Services filed with the IRS, Todd signed as its corporate Secretary.

14

the funds was unauthorized. However, even after Richard learned Todd was systematically misusing Service's funds, he took no formal action to ensure it stopped. Rather, he merely trusted Todd to stop and repay the money. Moreover, Richard allowed Todd to retain all control over the accounts.[10] Unfortunately, the trust and confidence Richard placed in Todd also gave him significant control over Services that a company would not ordinarily grant a receptionist.

Richard's and Todd's control through dual involvement in the companies is underscored by the size of each company. Todd testified that the companies seasonally varied in size from two to ten employees. Thus, the companies do not appear to have had layers of management, and it is fair to infer that the two had a heavy, though not necessarily equal hand in the operation of both.

The nature of wnership also favors finding Services an alter ego of Sheet Metal. "In establishing common ownership, ownership by members of the same family may be considered." *Northwest Ohio Adm'rs, Inc. v. S.E.A. Builders Corp.*, 3:99CV7406, 2001 WL 1344826 (N.D. Ohio) (citing *Centeral States Southeast & Southwest Areas Pension Fund*, 902 F.2d 593, 597 (7th Cir. 1990) (collecting cases). Here, the same family owned both businesses. Janice, the sole owner of Services, had no involvement in Services management or control. She merely acted as a passive owner so that Services could attempt to avoid legal issues under Sheet Metal's CBA. Sheet Metal, in addition, was transferred from Richard's parents to Todd and David for nominal consideration. I find this factor weighs strongly toward finding alter ego status.

---

[10] While Richard was still an owner at Sheet Metal, a receptionist embezzled Sheet Metal's funds. She was promptly fired.

I find this case distinguishable from *Rd. Sprinkler Fitters*, *supra,* 669 F.3d at 792. where the court affirmed the district court's grant of summary judgment to the defendant companies. The court explained the difference in management structure between the two entities in that case:

> (1) Christopher Dorn, who was lead salesman at Dorn Sprinkler is now the owner and President of Dorn Fire Protection; (2) his sister, Amy O'Shaughnessy, was front office manager and bookkeeper at Dorn Sprinkler and is now a bookkeeper at Dorn Fire Protection; and (3) David Dorn was President of Dorn Sprinkler and now does consulting work for Dorn Fire Protection. In light of these differences in management between the two companies, this factor militates against alter-ego status.

669 F.3d at 794-795.

The difference here is that the roles of the managers did not significantly change in the years where Richard exerted control over both Services and Sheet Metal. Although, as in that case, the corporate structure of the businesses remained separate, Richard and Todd appear to have had the same roles in both companies after Services' formation. They both retained significant influence over both. I therefore find this factor favors alter-ego status.

### 2. **Business and Operation**

Perhaps the most important indicator in this case of the overlap between Services and Sheet Metal is the frequency and extent with which Todd and David took money from Services on Sheet Metal's behalf. *See Central States*, 902 F.2d at 596-597. Richard initially authorized some borrowing, but testified he did not learn Todd continued unauthorized borrowing until 2003. To that point, Todd had taken about $192,000. Thereafter, he borrowed approximately $108,000 more.

After learning of the extent of the borrowing, Services took no action to seek repayment. It did nothing to stop future payments. In two relatively small companies, the amount borrowed strikes me as significant, and shows there was no real delineation between the two companies' financial

resources. Sheet Metal used Service's charge accounts, had access to its bank account, and even used its payroll services to pay Sheet Metal's employees on at least one occasion. In essence, there was one pot of money and both companies took from it as they pleased.[11] *See id.*

Services provided other uncompensated financial benefits to Sheet Metal. Sheet Metal and Services shared the same building, which Services owned, but the companies never executed a lease agreement and Sheet Metal never in fact paid rent.

Services adopted a substantially similar name as Sheet Metal for the admitted purpose of taking advantage of Sheet Metal's business goodwill. Similarly, Services created advertisements stating it had served the Toledo area since 1932, when Sheet Metal was formed, to take advantage of Sheet Metal's history and name. Testimony indicated the advertisements created consumer confusion between the two companies.

I have also considered the extent to which Sheet Metal and Services shared property and equipment. *See Rd. Sprinkler Fitters*, *supra,* 669 F.3d at 795-796. The testimony showed the companies at least had unfettered access to each others' equipment and tools. Todd stated he believed the companies occasionally shared trucks, equipment, and tools. Services retained some of Sheet Metal's trucks after it closed, but never paid for them. Though the companies had separate phone lines, they led to the same phone.

### 3. **Business Competition and Shared Customers**

When two companies compete in the marketplace, they are less likely alter egos. *See id.* at 795. Although Sheet Metal and Services were competitors to some extent, they did not truly compete

---

[11] The financial Planner the family employed when starting services stated the companies were intertwined and lacked any clear separation.

for customers in the marketplace. Todd stated that, while answering the phones for both companies, he sometimes "pilfered" business from Services to Sheet Metal. However it does not appear it was substantial, and even if it were, Todd had this opportunity only because of his involvement in both companies. Richard and Todd, additionally, testified that Sheet Metal primarily performed commercial work, and Services only residential, and I found that testimony credible.

Likewise, though the companies also shared some customers, they did not do so pervasively. *See id.* at 795. The Plan failed to show the ratio of shared customers to total customers amounted to a substantial intermingling.

However, Services used Sheet Metal's customer list to attempt to gain work after Sheet Metal went out of business. Services, in addition, continued to pay for Sheet Metal's phone line and used it to recruit Sheet Metal's customers after it went out of business. Although this does not show that the companies shared customers while Sheet Metal remained in business, it does tend to further show a degree of intermingling between the two companies. Sheet Metal's customer list and phone line were valuable, and on ceasing business, Sheet Metal simply gave Services these resources.

### 4. **Intent to Avoid the CBA**

Richard's actions show that he founded Services to avoid the burdens of Sheet Metal's collective bargaining agreement with the union. *See Allcoast Transfer*, 780 F.3d at 579; *Central States*, *supra*, 902 F.2d at 595 n. 3. Richard testified he formed Services after coming to the conclusion that Sheet Metal could not survive while continuing to pay the high cost of union labor. To allow himself to retain some control of both companies, Richard recruited his wife to serve as Service's passive owner. I find this intentional avoidance heavily favors imposing liability on Services.

This is not to say that Richard could not have made a clean break with Sheet Metal and formed Services. The problem, however, as discussed above, is that he and Todd had a strong hand in both companies for at least several years. I agree with the Plan that this is the precise type of behavior the law was meant to prohibit: to disallow simultaneously taking advantage of union and non-union work after entering into a collective bargaining agreement. *Central States*, *supra*, 902 F.3d at 595 (the owner of a union business started a non-union business under his wife's name because he could not afford to pay costs of union labor; the court held he intended to avoid CBA obligations under similar circumstances as this case).

Sheet Metal further benefitted from Richard's decision to start a separate business with non-union workers. As discussed above, Todd funneled a large amount of money to Sheet Metal from Services at a time when Sheet Metal was not profitable. Richard at least knew of Todd's conduct. In addition, Richard explained to Todd on several occasion the importance of keeping the companies strictly separate, showing that Todd knew his actions were improper. Thus, acting together, the two not only intentionally avoided CBA obligations, but did so in a way that allowed Services to operate successfully and ultimately fund Sheet Metal's operations. Both knew of the intermingling between the companies, and importantly, knew it was improper.

I find this sufficient to show intent to avoid CBA obligations.

**Conclusion**

For the foregoing reasons, I conclude that Services is the alter ego of Sheet Metal.[12] It is, therefore,

ORDERED THAT Enterprise Roofing & Remodeling Services, Inc., be, and the same hereby is found liable and responsible for the judgment (Doc. 59) previously entered in favor of plaintiff Local 134 Board of Trustees of the Toledo Roofers Pension Plan and against Enterprise Roofing & Sheet Metal Co.[13]

The Clerk shall set a status/scheduling conference forthwith.

So ordered.

s/James G. Carr<br>Sr. United States District Judge

---

[12] I acknowledge that the result I reach in this opinion differs from that which I anticipated reaching in remarks and observations at the close of testimony. I base this opinion on the post-hearing briefs and the discussion of the applicable law and standards the parties set forth therein and a review of the trial evidence and exhibits.

[13] I reserve judgment on whether the Plan may recover attorneys' fees and interest, and the amount of those fees and interest, if any.